**MAHAFFEY LAW GROUP, PC**
19900 MacArthur Blvd., Suite 1200
Irvine, CA 92612
Douglas L. Mahaffey SBN 125980
Kathryn L Greer  SBN 276569
Nicole C. Prado  SBN  269833

dougm@mahaffeylaw.com
kathryn@mahaffeylaw.com
nicole@mahaffeylaw.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MADMAN RECORDS LLC, and STEVEN MATHEW SEBOLDT p/k/a "STEVIE MATTHEW," an individual,<br><br>        Plaintiff,<br>    vs.<br>FAB FACTORY ENTERTAINMENT, LLC,<br><br>        Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiffs MadMan Records,  LLC ("MadMan" or "MadMan Records") and Steven Mathew Seboldt p/k/a "Stevie Matthew" ("Seboldt" or "Artist" and together with MadMan Records, "Plaintiffs") bring this action for relief against Fab Factory Entertainment, LLC, ("Fab Factory") a music entertainment investment business,  for breach of contract and breach of the covenant of good faith and fair dealing, intentional interference with economic advantage, declaratory relief, accounting and imposition of a constructive trust.

### INTRODUCTION

1.      This claim involves a highly successful recording artist, Stevie Matthew, who has suffered over a million dollars in losses and whose future royalties and expanded music career have been severely impaired by the tortious conduct and breach of two contracts entered into with Defendant Fab Factory Entertainment, LLC.

2.      Plaintiff Madman Records entered into an "Exclusive Recording Contract" and a Co-Publishing contract with Defendant, whereby Plaintiff Stevie Mathews through Madman Records would record and then co-publish a full album of ten tracks, with options to extend the relationship for future albums.

3.      After committing to the financing, promotion and payment of substantial fees and expenses, Defendant retreated from its contractual obligations and refused to perform. Defendants conduct occurred very late in the relationship and after Plaintiff delivered the agreed tracks with only minor final completion required before they could be released to the public. Defendant unilaterally declared the contract terminated stating effectively they "changed their mind" about promoting the copyrighted works Stevie Mathew had delivered and was completing. This termination declaration, and concurrent tortious conduct, was a bad faith breach of contract. Plaintiffs had fully relied on the promises and covenants contained in the agreements, and Stevie Mathew divested his entire recording portfolio and placed his future career in the hands of Defendant, who now have effectively destroyed it. Defendant has continued to breach its ongoing obligations of payment and performance of its duties under the contract, which is severely damaging Steve Mathew's future economic advantages.

4.      Plaintiffs seeks in addition to contractual rights arising out of past conduct of Defendant, declaratory relief as to the future rights of the parties. This relief arises out of the numerous artistic, copyrighted recordings Defendant received and their future co-publishing relationship with Plaintiffs as to the subject album and its ten recordings, once released to the public.

## II. JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under diversity of citizenship pursuant to 28 U.S.C. ¶ 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      Plaintiff MadMan Records, LLC is a limited liability company whose has two members, Adam Carpenter, a citizen of Texas and Steven Seboldt, a citizen of Georgia.

/ / /

7.    Defendant Fab Entertainment, LLC is a limited liability company whose members are Shaun R. Fabos and Steven Fabos. Both Shaun R. Fabos and Steven Fabos are California citizens. Complete diversity exists between the members of MadMan Records, LLC and the members of Fab Factory Entertainment, LLC.

8.    Venue is proper in this District under 28 U.S.C. ¶ 1391(b) and (c) because Defendant's two LLC members are citizens of this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and the agreements at issue were negotiated, executed, and to be performed in this District.

9.    The parties Exclusive Recording Agreement provides that it "shall only be construed in accordance with the substantive and procedural laws of the State of California" and that "any controversies arising out of this Agreement shall be brought by the parties to the State and Federal Courts located in Los Angeles, California." Exhibit A ¶18(e). The parties' fully executed Co-Publishing Agreement dated July 31, 2024, provides that "Only the California Courts shall have jurisdiction over this Agreement and any controversies arising out of this Agreement shall be brought by the parties to the State and Federal Courts located in Los Angeles, California, and they hereby grant sole and exclusive jurisdiction to such court(s)." Exhibit B ¶7.3.

## PARTIES

10.    Plaintiff MadMan does business in California, and is the contracting "you" under the parties' **Exhibit "A",** July 31, 2024, Exclusive Recording Agreement**.**

11.    Plaintiff Steven Mathew Seboldt p/k/a "Stevie Matthew" ("Seboldt") is a citizen of Georgia, and is a managing member of Madman Records, LLC. His co-managing member, Adam Carpenter, is a citizen of Texas. Seboldt is the recording artist whose exclusive recording and songwriting services were furnished to Defendant pursuant to the parties' agreements, and it Seboldt's future economic advantage that Defendants have tortiously interfered with.

12.    Defendant Fab Factory Entertainment, LLC does business at 7240 Fulton Ave, North Hollywood, California.

13.    Fab Factory is the "Company" and "Publisher" under the parties' recording and co-publishing agreements. (Exhibits A and B).

# FIRST CLAIM

## BREACH OF CONTRACT (RECORDING AGREEMENT).

14.    Plaintiffs reallege and incorporate by reference paragraphs 1–13 as if fully set forth herein.

15.    Effective July 31, 2024, MadMan, furnishing the personal services of Seboldt and Fab Factory entered into a written Exclusive Recording Agreement (attached hereto as **Exhibit "A"**, the "Recording Agreement"). The Recording Agreement recites that MadMan, "furnishing the personal services of Steven Mathew Seboldt p/k/a Stevie Matthew ('Artist')," "shall furnish Artist's exclusive musical recording services to [Fab Factory]."

16.    Under paragraph 2 of the Recording Agreement, the "Term" consists of an Initial Period and one Option Period. The Initial Period commences on the Effective Date of July 31, 2024, and ends on the later of: (i) twelve months following "Delivery" of the final "Side" comprising Artist's recording commitment for the applicable Contract Period; or (ii) nine months after the initial commercial release of the last Recording delivered in fulfillment of that commitment. (See **Exhibit "A", 2(a)**.)

17.    Paragraph 3, titled "Minimum Recording Obligation," provides that during each Contract Period, Artist shall exclusively deliver to Fab Factory a specified number of "Sides" that are "satisfactory and acceptable to Company in its sole discretion," and identifies a minimum commitment of 10 Sides for the Initial Period and 10 Sides for the Option Period. The Agreement defines each required Side as a "Commitment Product." Id. ¶3(a).

18.    Paragraph 3(b) specifies the delivery schedule as: "[A]rtist will fulfill the Recording Commitment for each Contract Period by delivering the Recording Commitment within the first six (6) months of the then-current Contract Period <u>unless otherwise agreed between the parties hereto</u>." (<u>emphasis added</u>). Of critical importance is the parties did not specify how they would agree, and in good faith the extension agreement could be verbal, implied by conduct or confirmed directly or indirectly in writing.

19.    The Recording Agreement further obligated Fab Factory to pay a recording advance of Five Hundred Thousand Dollars ($500,000) for the Initial Period, in four installments,

and to fund a Recording Budget of Three Hundred Thousand Dollars ($300,000) for the Initial Period, as well as to mutually approve and fund a Marketing Budget, which the Agreement sets at Seven Hundred Thousand Dollars ($700,000) for the Initial Period. Id. ¶3A.

20.    The Recording Agreement further obligates Defendant to pay Royalties to Seboldt in the sum of 20% to 40% of Net Revenues, depending on the amount of annual Net Revenues, as a "credit to Artist's account", which royalties are to be generated from "the exploitation of the Sides throughout the territory". ¶4A.

21.    Paragraph 3A(c) provides that the Marketing Budget in respect of the Initial Period of $700,000 "is hereby approved," and that "the payment of all monies from the Marketing Budget shall be administered by Company."

22.    The Recording Agreement required Seboldt to assign all "Prior Materials" that Seboldt had recorded, including the assignment of all copyrights to the Prior Materials, in exchange for Defendant to have exclusive rights to "manufacture, advertise, distribute, sell and otherwise exploit and deal in the Prior Materials and Records derived therefrom". ¶8A.

23.    The Recording Agreement required Seboldt to divest all his rights to all of Seboldt's websites, including "StevieMatthew.com" which transferred the rights to all web site created during the term, in "perpetuity". ¶9.

24.    The Recording Agreement transferred all of Seboldt's rights to his merchandise created from his name and likeness, "whether or not in connection with Recordings hereunder," which was to provide Defendant the merchandise to secure "sponsorships and endorsements, advertisements, branding, strategic partnerships, or other third-party entertainment business relationships". ¶10.

25.    The Recording Agreement provided that Defendant would receive 15% of monies generated to Seboldt from "endorsements, sponsorships, advertisements, branding, strategic partnerships or other third-party entertainment business relationships" and 10% of live appearances and performances of Seboldt. ¶11.

26.    Paragraph 12 (titled in the Agreement as "Suspension and Termination," though sometimes referred to as paragraph 15 in internal references) obligates Defendant, even if there

is a "Default Event" by Madman or Seboldt, to continue its "obligations and liabilities" with respect to "Recordings previously delivered."

27.    Paragraph 12 defines a "Default Event" and Fab Factory's remedies.

28.    A "Default Event" includes, among other things, that "you do not fulfill *any portion of your recording obligation* within thirty (30) days of the time limits set forth above," or that MadMan or Artist "breach or refuse, neglect or fail to comply with any other material obligations." (emphasis added).

29.    If there is a "Default Event", Fab Factory "will have the right, without prejudice to any of Company's rights or remedies, by notice to you, to suspend the running of the Term and payment of monies, terminate the Term or reduce Recordings, Advances, or other requirements hereunder (and, if Company terminates, Company will have no obligations or liabilities to you, except with respect to Recordings previously Delivered)."

30.    Following execution of the Recording Agreement, Plaintiff Seboldt delivered all of his "Prior Materials" for Defendant to copyright and exploit them, and Seboldt and Madman began recording, writing, and otherwise working diligently toward completion of a debut album (the "Album") embodying Seboldt's performances and the Compositions subject to the Recording and Co-Publishing Agreements.

31.    Under paragraph 3(b) of the Recording Agreement, the initial six-month period for delivery of the 10-Side Recording Commitment in the Initial Period ran up to January 31, 2025, "unless otherwise agreed between the parties hereto."

32.    The "within thirty (30) days" grace period of the initial Recording Commitment, as applied, would have terminated no sooner than August 31, 2025.

33.    After execution of the Recording Agreement, Plaintiffs diligently completed the delivery of the initial first ten sides, and on January 30, 2025, one day before the original "Recording Commitment" deadline, the parties agreed to extend the delivery deadline.

34.    The extension was confirmed in writing by Defendant agreeing that a creative director would be hired to assist in perfecting the first 10 sides.  Pursuant to that extension agreement, Fab Factory approved the hiring of industry executive Aaron Reid as Creative Director

and A&R consultant for the Album. Reid's role was to secure A-list features and provide creative direction for the Album.

35.    Reid's engagement commenced on or about February 1, 2025, and Fab Factory approved and paid his monthly retainer for the next three months.

36.    During that time, Reid secured with Seboldt's active assistance, among other things, a feature from Wiz Khalifa, and was actively working on a Ty Dolla $ign feature and broader creative direction for the Album.

37.    On April 28, 2025, the extension of the initial six-month deadline was further confirmed.

38.    On that date Fab Factory's President, Shaun Fabos, expressly approved in writing a three-month extension of Reid's agreement starting May 1, 2025, thereby continuing Fab Factory's funded A&R engagement through at least July 31, 2025.

39.    At all times during the extended time frame, Plaintiffs continued to fulfill their recording commitments.

40.    Pursuant to the recording completement extension, and as part of the contractual obligations of Defendant, during May, June, and July 2025, Fab Factory repeatedly approved, funded, and reimbursed recording, writing, production, and marketing costs–often through Seboldt's manager Justin Garza–in furtherance of the Album, including without limitation:

      a.      reimbursing a $1,500 writing fee for songwriter Anthony Clemons for a June 5, 2025, writing session on a track selected for the Album;

      b.      approving and paying approximately $2,560 in fees for vocal production and coaching sessions with renowned vocal coach "Mama Jan" in May–June 2025, in direct support of Seboldt's lead vocal recording for the Album (See **Exhibit D**);

      c.      paying invoices for engineering work on drum and vocal recording sessions conducted June 16–19, 2025 in Los Angeles (See **Exhibit E**); and

d.    approving a feature fee and terms for an AJ Mitchell feature on the Album in or about April 2025 (See **Exhibit F**).

41.    Fab Factory also hired the marketing firm Black Box to set up the Album's release campaign, with management and label calls occurring in May and June 2025 specifically to plan the Album's marketing and release.

42.    In connection with the Album, Fab Factory approved and committed to pay feature fees and other compensation to third-party artists and collaborators, including without limitation Wiz Khalifa and AJ Mitchell. As of the date of the Termination Letter, Fab Factory had failed to pay approximately $160,000 in such approved fees, leaving Plaintiffs exposed to claims from those third parties and damaging Plaintiffs' professional relationships and reputation in the industry.

43.    Throughout this time, and based on a good faith reliance of the extension of the initial ten sides delivery date of January 31, 2025 to July 31, 2025, Seboldt and MadMan were actively recording, writing, and finalizing the Album, in lockstep with Fab Factory's executive team, creative director, and marketing partners, all with Fab Factory's knowledge, approval, and financial support.

44.    On July 10, 2025, Defendant delivered to counsel for Plaintiffs, a letter that stated in part, "This letter constitutes formal notice of a Default Event and termination of the Agreement." ("the Termination Letter", **Exhibit C**).  The Termination Letter stated that MadMan Records had failed to comply with its recording obligation "for the initial period" and that the Defendant "hereby exercises its option to terminate the [Exclusive Recording Agreement] pursuant to paragraph 12(a)."

45.    The Termination Letter does not identify any specific failure by Plaintiffs to comply with reasonable delivery instructions or technical delivery requirements, nor does it acknowledge the parties' express and implied extensions of the delivery schedule through at least July 31, 2025, or the ongoing work and expenditures funded and approved by Fab Factory in May–July 2025, nor does it identify express notice provisions.

/ / /

46.    At no point prior to its July 10, 2025, Termination Letter did Fab Factory ever notify Plaintiffs in writing that it considered the Recording Commitment overdue, that it believed a Default Event had occurred, or that it was imposing a hard cut-off to the extended delivery schedule that the parties had been operating under.

47.    Instead, by its express extension of Reid's engagement through July 31, 2025, its ongoing approvals and payments for recording, production, and marketing expenses in May–July 2025, and its active participation in planning the Album's release, Fab Factory agreed—both expressly and by course of dealing—to extend the delivery deadline for the 10-Side Recording Commitment through at least July 31, 2025, with a reasonable period thereafter to complete mixing, mastering, and final deliverables.

48.    Under paragraph 3(b)'s "unless otherwise agreed" language, and under California law governing waiver, modification, and estoppel, Fab Factory's conduct constituted a binding extension and modification of any original January 31, 2025, delivery deadline, and a waiver of any right to invoke that date as a basis for claiming a Default Event.

49.    Plaintiffs fully performed, or were excused from further performance, all material obligations under the Recording Agreement, including furnishing exclusive recording services, recording and delivering multiple Sides, and working diligently in good faith toward completion and timely delivery of the 10-Side Recording Commitment, as extended by the parties' agreement and course of performance.

50.    Defendant breached the Recording Agreement by ceasing its obligations and attempting to terminate its liabilities, after sending its Termination Letter.

51.    Defendant's July 10, 2025, termination was unsubstantiated, premature, and contrary to the parties' agreements and course of dealing.

52.    Defendant's Termination Letter was a contrived illegal effort to avoid Fab Factory's substantial remaining funding obligations under the Recording Agreement and Co-Publishing Agreement just as the Album, which as agreed was featuring famous artists with outstanding payments owed to collaborators, and substantial sunk cost, was nearing completion.

/ / /

53.     Defendant's breaches include, but are not limited to, the failure to pay feature fees and other compensation to third-party artists and collaborators, including without limitation Wiz Khalifa and AJ Mitchell, including approximately $160,000 Defendant had expressly approved.

54.     Defendant breached the Recording Agreement by failing to pay  all of the $500,000 recording advance; failure to reimburse recording and production costs; failure to pay the full amount of  the $300,000 Recording Budget; failure to spend the full amount of the $700,000 Marketing Budget; lost opportunities for income from the timely release and exploitation of the Album; and lost publishing income and opportunities caused by Fab Factory's failure to administer the Compositions properly.

55.     Defendant breached the Recording Agreement by failing to exploit and monetize for the benefit of Plaintiff Seboldt, his "Prior Materials" including failure to secure "endorsements, sponsorships, advertisements, branding, strategic partnerships or other third-party entertainment business relationships".

56.     Defendant breached the Recording Agreement by its failure to exploit and monetize for the benefit of Plaintiff Seboldt, the "Artist Website", including a failure to meet and receive input from Seboldt on the "look and feel" of the Website and related marketing of Seboldt.

57.     Defendant breached the Recording Agreement by failing to act in good faith in exercising any discretionary rights or approval rights under the Agreement.

58.     As a direct and proximate result of Fab Factory's breaches, Plaintiffs have suffered damages in an amount to be proven at trial but believed to be at least approximately $1.2 million in direct contractual and budgetary commitments, exclusive of consequential damages, interest, and attorneys' fees and costs.

59.     The damages caused include but are not limited to: unpaid portions of the $500,000 recording advance; unreimbursed recording and production costs; unpaid portions of the $300,000 Recording Budget; unpaid and unspent portions of the $700,000 Marketing Budget; lost opportunities for income from the timely release and exploitation of the Album; and lost publishing income and opportunities caused by Fab Factory's failure to administer the Compositions properly.

60.     Plaintiffs further seek attorneys' fees and costs according to proof.

## SECOND CLAIM

## BREACH OF CONTRACT (CO-PUBLISHING AGREEMENT)

61.     Plaintiffs reallege and incorporate by reference paragraphs 1–62 as if fully set forth herein.

62.     Paragraph 15A of the Recording Agreement, titled "Co-Publishing," requires Artist and MadMan simultaneously with the execution of the Recording Agreement to execute a co-publishing and exclusive administration agreement with Fab Factory or its publishing designee and expressly states that "Artist's execution of the Publishing Agreement is a material inducement for Company entering into this agreement and that a breach by Artist of the Publishing Agreement shall also constitute a breach of this Agreement."

63.     Effective July 31, 2024, Fab Factory (as "Publisher") and Seboldt (as "Owner," d/b/a MadMan Records Publishing) entered into a written Co-Publishing Agreement (the "Co-Publishing Agreement", attached as **Exhibit B**).

64.     Plaintiffs fully performed, or were excused from further performance, all material obligations under the Co-Publishing Agreement, including writing Compositions subject to the Agreement and granting Fab Factory an undivided 50% interest and exclusive administration rights.

65.     In the Co-Publishing Agreement, Owner transferred to Fab Factory an undivided fifty percent (50%) interest in all of Owner's right, title, and interest in the defined "Compositions" throughout the territory, including "all copyrights, rights to copyrights therein and any other rights relating to the Compositions," together with renewals and extensions.

66.     The Co-Publishing Agreement appoints Fab Factory as exclusive administrator of those Compositions, and grants Fab Factory "the sole and exclusive right, during the Term and Retention Period, in the Territory, to administer, control, use, exploit, and otherwise deal in and for the Compositions and collect income in connection therewith whenever earned … and/or license others to do so, all of which Publisher hereby agrees to do in accordance with business practices generally prevailing in the music publishing industry." **Exhibit B** ¶2.2.

67.    Fab Factory's exclusive rights include, among others, the right to make and license mechanical reproductions, to license public performance and synchronization uses, to enter into sub-publishing agreements, to use Artist's and Owner's names and likenesses in connection with exploitation of the Compositions, and to prosecute and settle infringement claims.

68.    The Co-Publishing Agreement obligates Fab Factory to account to Owner for specified royalty percentages of "Publisher's Net Income" derived from public performance, mechanical, cover record, and synchronization income, and to compute and account for royalties on a semi-annual basis.

69.    The Co-Publishing Agreement identifies ten prior Compositions owned or controlled by Seboldt, including "Close to You," "Famous," "Hall Of Fame," "Bubblegum," "All The Time In The World," "Shadow," "Bigger Bag," "Care For You," "Tae Kwon Do," and "Get Your Girl," and recites the writer and publisher splits for each.

70.    The Co-Publishing Agreement provides that the "Term" will last for an initial three-year "First Period" or until all recoupable advances have been recouped, whichever is later, with one optional "Second Period" (Option Period), and that "Publisher shall retain all rights acquired by it under this Agreement for the life of copyright in each Composition" during the defined "Retention Period."

71.    The Co-Publishing Agreement incorporates the same California governing-law and Los Angeles forum-selection provisions quoted above.

72.    Fab Factory has breached its obligations under the Co-Publishing Agreement by *inter alia* failing to take basic, industry-standard steps to administer and exploit the Compositions, including failing to register the Compositions and related copyrights on a timely basis; failing to ensure proper registration and affiliation with relevant performing rights organizations, mechanical rights agencies, and sound recording rights organizations; and failing to take reasonable steps to secure and collect income arising from the exploitation of the Compositions.

73.    Fab Factory has breached its obligations under the Co-Publishing Agreement by not registering some or all of the Compositions listed in Schedule A or additional Compositions written by Seboldt during the Term, nor has it timely accounted or paid any royalties in connection

with those Compositions despite its exclusive administration rights and its contractual obligation to administer the Compositions "in accordance with business practices generally prevailing in the music publishing industry."

74.     Fab Factory's failure and refusal to properly administer, register, exploit, and account for the Compositions, in combination with its wrongful termination of the Recording Agreement and refusal to continue exploiting the masters, has effectively stranded Plaintiffs' recordings and songs, depriving them of the benefit of their bargain and of meaningful exploitation of their works.

75.     Fab Factory breached the Co-Publishing Agreement by, failing to compute, account for, and pay royalties as required.

76.     Fab Factory breached the Co-Publishing Agreement by wrongfully repudiating its long-term relationship with Seboldt and the exploitation of the Compositions by its wrongful termination of the Recording Agreement and its refusal to proceed with the Album and related publishing exploitation.

77.     As a direct and proximate result of Fab Factory's breaches of the Co-Publishing Agreement, Plaintiffs have suffered damages in an amount to be proven at trial, including lost publishing income and opportunities, unrecovered advances, and harm to the exploitation prospects of the Compositions and the Album.

78.     Plaintiffs further seek all attorneys' fees and costs for these breaches.


**THIRD CLAIM**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

79.     Plaintiffs reallege and incorporate by reference paragraphs 1–78 as if fully set forth herein.

80.     Implied in the Recording Agreement and Co-Publishing Agreement is a covenant of good faith and fair dealing, obligating each party not to do anything that would unfairly interfere with the other party's right to receive the benefits of the contracts.

81.     Fab Factory breached the implied covenant by, among other things:

a.   Encouraging and approving continued work on the Album—
via extended A&R engagement, approvals and payments of
recording and production costs, and engagement of a
marketing firm—only to abruptly and unjustifiably
terminate the Recording Agreement;

b.   Invoking a supposed missed deadline that it had itself
extended and waived;

c.   Using its asserted unilateral "sole discretion" over
acceptability and timing as a pretext to avoid its funding
obligations once costs mounted; and

d.   Failing to take reasonable steps to exploit and administer the
Compositions despite having acquired a 50% ownership
stake and exclusive administration rights.

82.   Fab Factory's conduct unfairly frustrated Plaintiffs' right to realize the benefit of their bargain: a fully financed, properly supported, and meaningfully exploited Album and publishing catalog.

83.   Plaintiffs further seek all consequential damages arising from the breach of the implied covenant of good faith and fair dealing in the Recording and Co-Publishing Agreement.

84.   At the time of contracting, Fab Factory knew or reasonably should have known that Plaintiffs' professional reputation and industry relationships were essential to Seboldt's career as a recording artist and songwriter, and that breach of the Recording Agreement and Co-Publishing Agreements, would foreseeably cause damage to those relationships. Specifically, Fab Factory knew that:

a.   The music industry is relationship-driven, and an artist's
ability to secure features, collaborations, and future
opportunities depends on maintaining a reputation for
professionalism and ensuring that collaborators are
compensated for their work;

b.      Plaintiffs had cultivated relationships with established artists and industry professionals—including Wiz Khalifa, AJ Mitchell, Travis Mills, and other "top level writers and artists"—and had introduced many of these contacts to Fab Factory as part of the value Plaintiffs brought to the Recording Agreement;

c.      Fab Factory's approval and funding of features and collaborations for the Album created expectations among third-party collaborators that they would be compensated, and that Plaintiffs' reputation would be tied to whether those expectations were met;

d.      Termination of the Recording Agreement without satisfying approved obligations to collaborators would leave Plaintiffs associated with a failed project on which industry professionals were not paid; and

e.      Damage to Plaintiffs' industry reputation would impair Seboldt's ability to secure future recording agreements, publishing deals, features, co-writes, and other career opportunities, resulting in diminished earning capacity.

85.     As a direct, proximate, and foreseeable result of Fab Factory's breaches of the covenants of Good Faith and Fair Dealing in the Recording Agreement and Co-Publishing Agreement, Plaintiffs have suffered consequential damages including but not limited to:

a.      Injury to Seboldt's professional reputation in the music industry, including his standing among artists, producers, songwriters, and label executives with whom he has worked or seeks to work;

b.      Damage to Plaintiffs' relationships with Wiz Khalifa, AJ Mitchell, and other collaborators who performed work on

the Album in reliance on Fab Factory's commitments and who remain unpaid;

c.    Loss of future collaboration opportunities with these artists and others in their professional networks who have learned of or will learn of Fab Factory's failure to honor its commitments;

d.    Diminished ability to attract features, co-writes, and creative partnerships for future projects due to Plaintiffs' association with the failed Album and unpaid collaborator fees;

e.    Impairment of Plaintiffs' ability to secure future recording agreements, publishing deals, and other contractual opportunities, as prospective partners evaluate Seboldt's track record and industry relationships; and

f.    Reduced earning capacity and career trajectory resulting from the foregoing reputational harm, in an amount to be proven at trial.

86.    These consequential damages were within the reasonable contemplation of the parties at the time of contracting and are the natural and foreseeable result of Fab Factory's breaches. Fab Factory, as a record label operating in the music industry, understood that an artist's reputation and relationships are career-defining assets, that its own conduct in administering the Recording Agreement would reflect on Plaintiffs, and that breach of its financial commitments to third-party collaborators would inevitably cause reputational harm to the artist associated with the project.

87.    As a direct and proximate result, Plaintiffs have suffered these consequential damages in an amount to be proven at trial.

/ / /

/ / /

/ / /

**FOURTH CLAIM**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**(AS TO SEBOLT ONLY)**

88.     Plaintiff Seboldt realleges and incorporates by reference paragraphs 1–87 as if fully set forth herein.

89.     At all relevant times, Plaintiff maintained economic relationships with third-party artists, songwriters, producers, and industry professionals—including without limitation Wiz Khalifa, AJ Mitchell, and the other collaborators, writers, and contacts identified in the course of producing the Album, that carried the probability of future economic benefit to Plaintiff.

90.     These relationships represented not only the specific collaborations approved for the Album, but also the foundation for Seboldt's ongoing career as a recording artist and songwriter, including future features, co-writes, and professional opportunities with these individuals and their networks.

91.     Fab Factory had actual knowledge of these economic relationships. Fab Factory approved the engagement of these collaborators, negotiated or approved their fees, and was aware that Plaintiffs had introduced Fab Factory to many of these contacts, including Travis Mills and other "top level writers and artists", as part of the value Plaintiff Seboldt brought to the Recording Agreement.

92.     Fab Factory's willfully defrauded Plaintiffs into continuing to work diligently on the Album, concealing their intent to not perform.  Defendant concealed that it had no intention of completing the following conduct, inducing Plaintiff Sebolt into continuing to diligently complete that Album, with the Defendant's knowledge that if Plaintiff learned of Defendants concealed plan to destroy Seboldt, Plaintiff would have never entered into contracts with them. Specifically, Fab Factory defrauded Plaintiff by concealing that they had no intention to:

      a.     Pay approximately $160,000 in fees that Fab Factory had

            approved and committed to pay to Wiz Khalifa, AJ Mitchell,

            and other collaborators for their contributions to the Album,

leaving these industry professionals unpaid for work performed in reliance on Fab Factory's commitments;

b.     Perform the Recording Agreement, with the pre-mediated plan to terminate it after obtaining all of Plaintiffs prior materials and new recordings; and

c.     Complete their obligations of funding the marketing, recording, and exploiting Plaintiffs recordings for the benefit of Plaintiff.

93.     Defendant exploited in bad faith Sebolt's trust causing him to surrender his entire portfolio of "Prior Materials" with a concealed intent to not perform Defendants marketing and networking obligations, knowing this would severely cripple Sebolt's existing and economic advantages.

94.     This fraudulent, willful concealment of material facts is conduct that was "wrongful by some legal measure other than the fact of interference itself."

95.     As a direct and proximate result of Fab Factory's independently wrongful conduct, Plaintiffs' existing and future economic advantages in the industry, including but not limited to his relationships with Wiz Khalifa, AJ Mitchell, and other collaborators have been severely interfered with.

96.     Plaintiff Sebolt and MadMan Records are now associated in the music industry with a failed project on which collaborators were not paid, damaging Plaintiff's professional reputation and Sebolt's ability to secure future collaborations with these artists and others in their professional networks.

97.     Fab Factory understood that the music industry is relationship-driven, that artists and collaborators share information about which labels and artists pay (and fail to pay) their obligations, and that leaving Plaintiff Seboldt and his affiliate company MadMan Records unable to pay substantial related debtors, including but not limited to the $160,000 in unpaid fees while terminating the deal would inevitably damage Plaintiff's economic advantages in the industry.

/ / /

98.    As a direct and proximate result of Fab Factory's intentional interference with Plaintiff Seboldt's economic advantages, Plaintiff has suffered and continue to suffer economic harm, including but not limited to: (a) damage to Plaintiff's professional reputation and relationships in the music industry; (b) loss of future collaboration opportunities with Wiz Khalifa, AJ Mitchell, and other artists and writers; (c) diminished ability to attract features, co-writes, and other creative partnerships for future projects; and (d) reduced earning capacity and career prospects resulting from the foregoing, all in an amount to be proven at trial.

99.    Fab Factory's conduct was willful, oppressive, and malicious. Fab Factory knew that its concealment of material facts to induce Plaintiff into the original agreements, and to induce Plaintiff to surrender all his ownership of all his recordings, would destroy Plaintiff's reputation and cause permanent loss of industry relationships.

100.    Fab Factory in engaging in this tortious conduct, acted with conscious disregard for Plaintiffs' rights and interests, prioritizing its own desire to escape its financial commitments over the foreseeable and severe consequences to Plaintiffs' careers.

101.    Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Fab Factory and deter similar conduct in the future.

**FIFTH CLAIM**

**DECLARATORY RELIEF (DETERMINATION OF COPYRIGHT OWNERSHIP AND REVERSION OF RIGHTS) (28 U.S.C. ¶ 2201; 17 U.S.C. ¶ 101 et seq.)**

102.    Plaintiffs reallege and incorporate by reference paragraphs 1–101 as if fully set forth herein.

103.    An actual controversy exists between the parties concerning ownership of: (a) all master recordings embodying Artist's performances recorded in connection with the Recording Agreement; and (b) all musical Compositions subject to the Co-Publishing Agreement, including but not limited to the ten Compositions identified in Schedule A and all additional Compositions written by Seboldt during the Term.

104.    Fab Factory continues to assert ownership of the master recordings and a fifty percent undivided interest in, and exclusive administration rights over, the Compositions.

Plaintiffs contend that Fab Factory's material breaches and wrongful termination have extinguished any rights Fab Factory acquired under those agreements and caused such rights to revert to Plaintiffs.

105.    Absent a judicial determination of ownership, Plaintiffs face a real and reasonable apprehension that they will be subject to claims of infringement or interference if they attempt to license, release, perform, distribute, or otherwise exploit their own creative works, or enter into agreements with other record labels or music publishers.

106.    The controversy requires immediate resolution because: (a) Fab Factory has repudiated its performance obligations under both agreements; (b) Fab Factory has materially breached the Recording Agreement by failing to pay approximately $160,000 in approved collaborator fees; (c) Fab Factory has materially breached the Co-Publishing Agreement by failing to register, administer, or exploit the Compositions; (d) Fab Factory's July 10, 2025 Termination Letter purports to retain all rights while disclaiming all obligations; and (e) Plaintiffs cannot commercially exploit their creative works while Fab Factory's adverse ownership claims remain unresolved.

107.    Plaintiffs seek a judicial declaration that:

    a.    Fab Factory's material breaches of the Recording Agreement and Co-Publishing Agreement, including its wrongful termination, failure to pay approved collaborator fees, and failure to properly administer the Compositions, constituted first material breaches that excused Plaintiffs' further performance and divested Fab Factory of any rights it may have acquired under those agreements;

    b.    Any rights Fab Factory purported to acquire in the master recordings and Compositions have reverted to Plaintiffs by operation of law and/or equitable principles;

    c.    Plaintiffs are the sole owners of all right, title, and interest (including all copyrights and associated rights) in and to: (i)

all released and unreleased master recordings embodying Artist's performances recorded in connection with the Recording Agreement; and (ii) all musical Compositions subject to the Co-Publishing Agreement, including but not limited to the ten Compositions listed on Schedule A and all additional Compositions written during the Term;

d.    Fab Factory has no right, title, or interest in the master recordings or Compositions, and no right to administer, license, exploit, or encumber such works; and

e.    Plaintiffs are free to license, release, distribute, perform, and otherwise exploit the master recordings and Compositions without restriction or liability to Fab Factory.

108.    This declaration will serve the useful purpose of clarifying the legal relationships among the parties, removing a cloud on Plaintiffs' copyright interests, and permitting Plaintiffs to commercially exploit their creative works without fear of infringement claims or third-party liability.

109.    Plaintiffs seek, among other remedies, damages, rescission or partial rescission of the Co-Publishing Agreement, reassignment of copyrights in the master recordings and Compositions, and an equitable override structure that fairly compensates Fab Factory on a going-forward basis while allowing Plaintiffs to complete, release, and exploit the Album and the Compositions.

## SIXTH CLAIM

## ACCOUNTING AND CONSTRUCTIVE TRUST

110.    Plaintiffs reallege and incorporate by reference paragraphs 1–109 as if fully set forth herein.

111.    Fab Factory, by virtue of its role as record label and exclusive music publisher/administrator, stands in a special position of trust and control over income streams arising from the exploitation of the masters and Compositions.

112. Plaintiffs are entitled to a full and complete accounting from Fab Factory with respect to all revenues, advances, recoupments, and expenditures under the Recording Agreement and Co-Publishing Agreement, including but not limited to advances paid, Recording Budget expenditures, Marketing Budget expenditures, and all income, if any, derived from the masters and Compositions.

113. To the extent Fab Factory has received or hereafter receives any monies or benefits arising from the exploitation or assertion of rights in the masters and Compositions that in equity and good conscience belong to Plaintiffs, Fab Factory should hold those monies and benefits as constructive trustee for Plaintiffs.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendant, as follows:

**As to the First Claim (Breach of Contract-Recording Agreement):**

1. For compensatory damages in an amount to be proven at trial, but not less than approximately One Million Two Hundred Thousand Dollars ($1,200,000) for Fab Factory's breaches of the Recording Agreement, including unpaid advances, Recording Budget amounts, and Marketing Budget amounts, plus pre- and post-judgment interest.

**As to the Second Claim (Breach of Contract-Co-Publishing Agreement):**

1. For compensatory damages in an amount to be proven at trial for Fab Factory's breaches of the Co-Publishing Agreement, including lost publishing income and opportunities, unrecovered advances, and harm to the exploitation prospects of the Compositions and the Album.

**As to the Third Claim (Breach of the Implied Covenant of Good Faith and Fair Dealing):**

1. For compensatory damages in an amount to be proven at trial for Fab Factory's breaches of the implied covenant of good faith and fair dealing in both the Recording Agreement and Co-Publishing Agreement.

2. For consequential damages for injury to Plaintiffs' professional reputation and industry relationships, including damage to relationships with collaborators, loss of future

collaboration opportunities, diminished ability to secure future recording agreements and publishing deals, and reduced earning capacity, all as were within the reasonable contemplation of the parties at the time of contracting, in an amount to be proven at trial.

**As to the Fourth Claim for Intentional Interference with Economic Advantage**

1.     For compensatory damages arising from Fab Factory's intentional interference with Plaintiffs' prospective economic advantage, including damages for injury to professional reputation, loss of industry relationships with Wiz Khalifa, AJ Mitchell, and other collaborators, diminished ability to attract features and co-writes, and reduced earning capacity and career prospects, in an amount to be proven at trial.

2.     For punitive damages in an amount sufficient to punish Fab Factory for its willful, oppressive, and malicious conduct and to deter similar conduct in the future.

**As to the Fifth Claim for Declaratory Relief:**

1.     For a judicial declaration that:

    a.     Fab Factory's material breaches of the Recording Agreement and Co-Publishing Agreement, including its wrongful termination, failure to pay approved collaborator fees, and failure to properly administer the Compositions, constituted first material breaches that excused Plaintiffs' further performance and divested Fab Factory of any rights it may have acquired under those agreements;

    b.     Any rights Fab Factory purported to acquire in the master recordings and Compositions have reverted to Plaintiffs by operation of law and/or equitable principles;

    c.     Plaintiffs are the sole owners of all right, title, and interest (including all copyrights and associated rights) in and to: (i) all released and unreleased master recordings embodying Artist's performances recorded in connection with the Recording Agreement; and (ii) all musical Compositions subject to the Co-Publishing Agreement, including but not limited to the ten Compositions listed on Schedule A and all additional

Compositions written during the Term;

d.    Fab Factory has no right, title, or interest in the master recordings or Compositions, and no right to administer, license, exploit, or encumber such works;

e.    Plaintiffs are free to license, release, distribute, perform, and otherwise exploit the master recordings and Compositions without restriction or liability to Fab Factory; and

f.    For an order of specific performance and/or rescission requiring Fab Factory to assign and transfer to Plaintiffs all right, title, and interest (including copyrights and associated rights) in and to:

g.    All released and unreleased sound recordings embodying Artist's performances recorded in connection with the Recording Agreement, such that MadMan (for the benefit of Seboldt) becomes the sole owner of the master recordings; and

h.    All copyrights in the musical Compositions subject to the Co-Publishing Agreement, such that Seboldt (and/or his publishing designee) becomes the sole owner and administrator of such Compositions.

2.    **In the alternative**, to the extent the Court determines that Fab Factory should retain an economic participation in the masters and/or Compositions notwithstanding its breaches, for an order establishing the following minimum structure:

a.    Budgets / Damages: That Fab Factory pay MadMan a lump-sum amount of at least Six Hundred Thousand Dollars ($600,000) in satisfaction of Plaintiffs' monetary claims for unpaid portions of the recording advance, Recording Budget, Marketing Budget, and related damages, with Plaintiffs waiving the balance of approximately $600,000 in additional amounts claimed under the agreements;

b.    Album Completion and Control: That MadMan be authorized to complete and release the Album, with MadMan having full control over the timing,

manner, and marketing of the Album's release, subject to a commercially reasonable marketing campaign;

c.  Label/Distribution Freedom: That MadMan be free to license the Album to any third-party label or distributor of its choosing, provided that any such arrangement honors Fab Factory's override participation ordered by the Court;

d.  Override Royalty-Records: That, on digital exploitations of the Album, MadMan shall pay Fab Factory (i) a license fee or override equal to eighty percent (80%) of gross receipts from the master "All The Time In The World," and (ii) a twenty percent (20%) override on gross receipts from all other masters on the Album; and that on physical record sales, Fab Factory shall receive a five percent (5%) override on publisher's price to dealer (PPD); that such overrides be payable from "record one," in perpetuity, regardless of recoupment, and not subject to deductions other than bona fide third-party distribution fees, with Fab Factory using best efforts to have any distributor pay the override directly to Fab Factory;

e.  Override Royalty-Publishing: That MadMan engage a third-party publishing administrator for the applicable Compositions and that, after assignment of full copyrights to Seboldt or his designee, Fab Factory retain a twenty-five percent (25%) share of net publishing monies (net of third-party administration fees) as an override, with MadMan using best efforts to ensure that the publishing administrator pays Fab Factory's override directly; and

f.  Mutual Release: That the parties execute mutual general releases with standard terms and conditions, such that, other than the above-described participation rights and obligations, no further obligations exist between the parties with respect to the Recording Agreement, Co-Publishing Agreement, or the Album.

**As to the Sixth Claim (Accounting and Constructive Trust):**

1.      For a full accounting from Fab Factory of all revenues, advances, recoupments, and expenditures under the Recording Agreement and Co-Publishing Agreement, including but not limited to advances paid, Recording Budget expenditures, Marketing Budget expenditures, and all income, if any, derived from the masters and Compositions.

2.      For an order imposing a constructive trust over any monies or benefits Fab Factory has received or hereafter receives arising from the exploitation or assertion of rights in the masters and Compositions that in equity and good conscience belong to Plaintiffs, and for restitution and disgorgement of any such monies or benefits wrongfully retained by Fab Factory.

**As to all Claims:**

1.      For pre- and post-judgment interest at the maximum rate permitted by law.

2.      For an award of Plaintiffs' reasonable attorneys' fees and costs to the maximum extent permitted by contract or applicable law.

3.      For such other and further legal or equitable relief as the Court deems just and proper.


DATED: February 20, 2026


Respectfully submitted,

_____
Douglas L. Mahaffey
**MAHAFFEY LAW GROUP, PC**
19900 MacArthur Blvd., Suite 1200
Irvine, CA 92612
Douglas L. Mahaffey SBN 125980
Kathryn L Greer  SBN 276569
Nicole C. Prado  SBN 269833